**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **VETNIQUE LABS LLC**, an Illinois limited liability company, ) ) ) | |
| Plaintiff, ) ) | Case No: 1:24-cv-05199 |
| v. ) ) | JURY TRIAL DEMANDED |
| **DANIEL RAMIREZ**, a natural person, and **JOHN DOES 1-10**, individually or as corporations/business entities, ) ) ) ) | |
| Defendants. ) | |

**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR
VIOLATION OF 15 U.S.C §§ 1114, 1125(A), AND RELATED STATE CLAIMS**

Plaintiff Vetnique Labs LLC ("Vetnique" or "Plaintiff"), brings this action against defendants Daniel Ramirez and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) violation of the Illinois Uniform Deceptive Trade Practices Act; (4) common law trademark infringement; and (5) tortious interference with existing contracts and business relationships. These claims arise from Defendants' misappropriation of Vetnique's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Vetnique's trademarks. In support of its complaint, Vetnique alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Vetnique is a limited liability company, organized under the laws of Illinois, with its principal place of business in Naperville, Illinois.

2.     Daniel Ramirez ("Ramirez") is a natural person who, upon information and belief, resides at 11139 Chimineas Avenue Porter Ranch, CA 91326.  Ramirez operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "VeDa Express LLC" (the "Amazon Storefront").  The Amazon Storefront has an Amazon "merchant ID" of A2IU1K21JNQCVG and can be accessed at https://www.amazon.com/sp?seller=A2IU1K21JNQCVG.  Ramirez sells infringing products bearing Vetnique's trademarks through the Amazon Storefront and does business throughout the United States through the Amazon Storefront, including in Illinois.

3.     Vetnique believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Vetnique.  Therefore, Vetnique sues these defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Vetnique will seek leave to amend this Complaint accordingly.  If Vetnique does not identify any such parties, it will dismiss these defendants from this action.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  Vetnique's federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a), and its claims arising under the laws of the State of Illinois are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

5. This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Illinois and established sufficient minimum contacts with Illinois by, among other things, advertising and selling substantial quantities of infringing products bearing Vetnique's trademarks to consumers within Illinois through a highly interactive commercial website, with knowledge that Vetnique is located in Illinois and is harmed in Illinois as a result of Defendants' sales of infringing products to Illinois residents. Defendants know that Vetnique is located in Illinois, among other reasons, because they received cease-and-desist letters informing them that Vetnique is located in Illinois and is harmed in Illinois by their unlawful actions. Vetnique's claims arise out of Defendants' substantial and regular sales of infringing products bearing Vetnique's trademarks to Illinois residents.

6. Venue is properly found in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Vetnique & Its Trademarks

7. Vetnique manufactures and distributes high quality veterinary, feeding, and health products for pets ("Vetnique products"). Vetnique allows its products to be sold to end-user consumers in the United States only by Vetnique itself and by sellers who Vetnique has expressly authorized to sell Vetnique products ("Authorized Sellers"). These sellers include national pet chains, independent retailers, and authorized veterinarian clinics.

8. Vetnique allows Authorized Sellers to sell Vetnique products only in approved channels and requires Authorized Sellers to abide by agreements, policies, and other rules that

3

impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Vetnique Rules").

9.      Vetnique devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By distributing Vetnique products to end-user consumers exclusively through itself and its Authorized Sellers that are required to follow the quality controls and other requirements in the Vetnique Rules, Vetnique ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of its brands.  In the highly competitive markets for veterinary, feeding, and health products for pets, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

10.     To promote and protect its brands, Vetnique has acquired rights to trademarks and registered numerous trademarks with the United States Patent and Trademark Office, including but not limited to: VETNIQUE LABS® (U.S. Trademark Reg. No. 5,002,867); GLANDEX (U.S. Reg. No. 4,203,651); PROFIVEX (U.S. Reg. No. 5,308,384); FURBLISS (U.S. Reg. Nos. 5,852,132 and 5,747,385); DERMABLISS (U.S. Reg. No. 6,330,297); and BOOT THE SCOOT! (U.S. Reg. No. 4,553,243) (collectively, the "Vetnique Trademarks"):

11.     The registration for each of the Vetnique Trademarks is valid, subsisting, and in full force and effect.

12.     Further, Vetnique's right to use many of the Vetnique Trademarks has become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, Vetnique received no final legal decision issued against the trademarks, and Vetnique timely filed a Section 15 Declaration describing the trademarks' use.  Accordingly, these trademarks serve as conclusive evidence of Vetnique's ownership of the marks and of its exclusive right to use and direct the use of

4

the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

13. Vetnique actively uses, advertises, and markets all of the Vetnique Trademarks in commerce throughout the United States.

14. Consumers recognize the Vetnique Trademarks as being associated with high quality veterinary, feeding, and health products for pets.

15. The Vetnique Trademarks are widely recognized by the general consuming public of the United States and Vetnique is recognized as the source of products bearing the Vetnique Trademarks.

16. Due to the superior quality and exclusive distribution of Vetnique's products, and because Vetnique is recognized as the source of high-quality products, the Vetnique Trademarks have substantial value.

**Online Marketplaces and the Challenge They Present to Vetnique Product Quality**

17. E-commerce retail sales have exploded over the past decade. From 2013 to the end of 2023, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 5.6% to 15.6%. E-Commerce Retail Sales as a Percent of Total Sales, FEDERAL RESERVE BANK OF ST. LOUIS (March 1, 2024), https://fred.stlouisfed.org/series/ECOMPCTSA.

18. In 2023, consumers spent approximately $1.12 trillion on ecommerce sales, a 7.6% increase from 2022. *See* Abbas Haleem, US ecommerce sales penetration hits new high, DIGITAL COMMERCE 360 (February 26, 2024), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

19.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

20.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

21.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

22.     It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.  *See* Khadeeja Safdar et al., *You*

6

*Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

23.     Third-party sellers on Amazon may also sell counterfeit items or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

24.     For example, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods."  Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7.  The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller."  *Id*. at 14-15, 38.  *See also* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

25.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-

fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019,

26.     In its annual reports to its shareholders beginning in 2018 and continuing each year to the present, Amazon has acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2024), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/c7c14359-36fa-40c3-b3ca-5bf7f3fa0b96.pdf.   Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

27.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the safety of consumers.

28.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

29.     When purchasing products on an online marketplace, customers do not know if a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.

30.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

31.     When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor-quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

32.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews. Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see. These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

33.     Online product reviews significantly impact a brand's reputation. Survey results show that 99.75% of United States consumers read reviews "at least sometimes" when they consider buying a new product online, and 45% will not purchase a product if there are no reviews available for it. *Survey: The Ever-Growing Power of Reviews (2023 Edition)*, Power Reviews, https://www.powerreviews.com/research/power-of-reviews-2023/ (last visited Mar. 1, 2024).

34.     Reviews are especially impactful on online consumers. In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears to be compromised. However, online consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality. Therefore, online consumers rely more on brand reputation and reviews.

35.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings. Not only are consumers less

likely to buy a product with negative reviews, websites like Amazon use algorithms to downgrade products it believes consumers are less likely to buy. Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to further downgraded product placement.

**Vetnique's Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written by Consumers Who Purchased Poor Quality Products From Unauthorized Sellers on Online Marketplaces**

36. Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product listings. These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

37. Numerous consumers have written negative reviews of Vetnique products being offered for sale on online marketplaces. In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Vetnique products low "ratings" and complained of receiving products that were damaged, previously used, tampered with, not sealed, and missing components.

38. For example, Defendants have sold on Amazon the product seen in the screenshot below:

10



Glandex Anal Gland Soft Chew Treats with Pumpkin for Dogs Digestive Enzymes, Probiotics Fiber Supplement for Dogs Boot The Scoot (Advanced Strength Duck/Bacon Chews (Vegetarian), 60ct)

Visit the Vetnique Labs Store

4.4 ★★★★☆ ⌄ 39,130 ratings

#1 Best Seller in Dog Digestive Remedies

7K+ bought in past month

-19% $29²³

Typical price: $35.99 ⓘ

Coupon: ☐ Save an extra 20% on your first Subscribe and Save order. Shop items › | Terms

Get $10 off instantly: Pay $19.23 $29.23 upon approval for the Amazon Store Card. No annual fee.

Flavor Name:

[Advanced Strength Duck/Bacon Chews (Vege...  ⌄]

Size: 60ct

[30ct]  [60ct]  [120ct]

39.    As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were previously used, tampered with, not sealed, and damaged because of improper storage:





11





40.     Below is a screenshot of another Vetnique product that Defendants have sold on

Amazon:



41.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were tampered with, not sealed, missing components, or of otherwise poor quality:







13

42.     The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Vetnique products listed on Amazon that Defendants have sold through their Amazon Storefront.  These reviews harm the reputation and goodwill of Vetnique and its brands because consumers around the world view and rely on these reviews, even when purchasing Vetnique products offline.  Even when the text of a review makes clear that a problem was seller-caused, negative reviews still lower the average review score and search placement of Vetnique products.

43.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants have sold a high volume of products bearing the Vetnique Trademarks on Amazon and are not subject to Vetnique's quality controls, however, it is exceedingly likely that some of the foregoing negative reviews—and the other similar negative reviews of Vetnique products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Vetnique Trademarks from Defendants.

**Vetnique Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Caused By Online Marketplaces and Ensure Customers Receive the Genuine, High-Quality Products They Expect From Vetnique**

44.     The above reviews show how sales of poor quality Vetnique products disappoint Vetnique's consumers and cause significant harm to the reputation and goodwill of Vetnique and its brands.  To protect itself and consumers from these harms, Vetnique implemented a quality control program that applies to all of its Authorized Sellers as well as to all products that Vetnique itself sells to consumers.

45.     The goals of Vetnique's quality control program are to minimize the likelihood that poor quality products reach consumers and ensure that consumers who purchase Vetnique products, including consumers who buy online and those that purchase in a brick-and-mortar

setting, receive the high quality products and services they expect from products sold under the Vetnique name. By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Vetnique Trademarks.

46. Vetnique's ability to exercise quality controls is particularly important for the products it sells because many of Vetnique's products are ingested by animals and there may be health and safety risks associated with products that have not been properly inspected, stored, or handled.

47. Vetnique abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

48. Vetnique's ability to exercise its quality controls is essential to the integrity and quality of Vetnique products, as well as the value of the Vetnique Trademarks and other intellectual property.

**Authorized Sellers May Sell Vetnique Products Only Through Specific Channels and Must Adhere to Vetnique's Quality Control and Customer Service Requirements**

49. Vetnique maintains strict quality controls over Vetnique products by allowing Vetnique products to be purchased by end-user consumers only from Vetnique itself or from Authorized Sellers.

50. All of Vetnique's Authorized Sellers are permitted to sell Vetnique products only in certain channels and are required to abide by the Vetnique Rules. Thus, every Authorized Seller that sells Vetnique products is subject to Vetnique's quality control requirements.

51. The Vetnique Rules require Authorized Sellers to purchase Vetnique products only from Vetnique directly or from other Authorized Sellers, per the applicable policy. This restriction

15

ensures that the chain of custody can be established for all Vetnique products sold to consumers by Authorized Sellers, and thus prevents unsafe or unsanitary products, secondhand goods, or other low-quality products from entering into the distribution chain.

52. The Vetnique Rules also limit to whom and where Authorized Sellers may sell Vetnique products. To prevent persons outside of Vetnique's quality controls from acquiring and reselling Vetnique products, the Vetnique Rules prohibit Authorized Sellers from selling Vetnique products to any third party who is not an Authorized Seller and who intends to resell the products. Authorized Sellers are permitted to sell Vetnique products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

53. Authorized Sellers are also prohibited from selling Vetnique products through any online marketplace website, including Amazon, without written permission from Vetnique. Because of the threats to consumer satisfaction and the value of Vetnique's trademarks that are caused by online marketplace sales, as discussed above, Vetnique does not currently allow any of its Authorized Sellers to sell Vetnique products on Amazon. Vetnique allows a small portion of its Authorized Sellers to sell Vetnique products on websites that they themselves own and operate, but all other Authorized Sellers cannot sell Vetnique products online at all unless they first apply for and receive written approval from Vetnique.

54. These restrictions are essential to Vetnique's ability to exercise its quality controls over Vetnique products because they prevent unauthorized sellers from obtaining and reselling Vetnique products and allow Vetnique to know where all of its products are being sold online by Authorized Sellers. If a quality issue arises through an online sale, Vetnique can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately. Vetnique is unable to take such action against unauthorized sellers because it does

16

not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

55.     In addition to restricting where and how Authorized Sellers can sell Vetnique products, the Vetnique Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Vetnique products.

56.     To ensure that customers receive the genuine and high-quality products they expect from Vetnique, the Vetnique Rules require Authorized Sellers to inspect all Vetnique products for any damage, defects, broken seals, evidence of tampering, and other non-conformance and remove all such products from their inventory.  Authorized Sellers are prohibited from selling damaged or defective products and are required to report any discovered defects to Vetnique to assist it with identifying any product quality issues.

57.     Authorized Sellers must also regularly inspect their inventory for any products that are expired or within 90 days of expiration ("Not-Current Products"), not sell any Not-Current Products to consumers, and destroy or dispose of Non-Current Products in accordance with instructions provided by Vetnique.

58.     The Vetnique Rules also require that Authorized Sellers store Vetnique products in a cool, dry, temperature-controlled and pest-controlled environment, away from any volatile chemicals, and in accordance with other guidelines issued by Vetnique.  These requirements help ensure that Vetnique products are stored properly and are not damaged prior to being shipped to the consumer.  Authorized Sellers must also manage product inventory on a "first-in, first-out" (FIFO) basis, with older inventory being sold before newer inventory of the same product.

59.     To avoid consumer confusion and ensure that customers receive genuine Vetnique products, Authorized Sellers must sell Vetnique products in their original packaging and are

prohibited from relabeling, repackaging, or altering Vetnique products or any accompanying label, literature, or safety-related information without Vetnique's consent. Authorized Sellers are prohibited from reselling any products that have been returned opened or repackaged.

60.     Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Vetnique products, including any serial number, UPC code, or other identifying information.

61.     The Vetnique Rules give Vetnique the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Vetnique products, to ensure their compliance with Vetnique's quality control requirements. During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of their sources of all Vetnique products. If Vetnique discovers that an Authorized Seller is failing to follow the Vetnique Rules, Vetnique has the right to cease selling its products to the Authorized Seller and to suspend or terminate its status as an Authorized Seller of Vetnique products.

62.     Authorized Sellers must also communicate all safety information to consumers and cooperate with Vetnique with respect to any product recall or other consumer safety information dissemination effort conducted by Vetnique regarding Vetnique products.

63.     The Vetnique Rules also require Authorized Sellers to provide various customer services to their customers. For example, Authorized Sellers must familiarize themselves with the features of all Vetnique products kept in their inventory so they can advise customers on the selection and safe use of Vetnique products, offer ongoing support to consumers, and promptly respond to consumer inquiries before and after the sale of genuine Vetnique products. Authorized Sellers must also report to Vetnique any customer complaint regarding a Vetnique product, assist

Vetnique in investigating any such complaint, and help customers themselves contact Vetnique's customer service if needed.

64.     Vetnique's quality control and customer service requirements are legitimate and substantial and have been implemented so that Vetnique can control the quality of goods manufactured and sold under the Vetnique Trademarks, to protect consumers as well as the value and goodwill associated with the Vetnique Trademarks.

65.     Vetnique's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products.  Consumers would find it material and relevant to their purchasing decision to know whether a Vetnique product they were considering buying was being sold by an Authorized Seller who is subject to Vetnique's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Vetnique's quality controls and over whom Vetnique is unable to exercise its quality controls.

### Given the Flood of Poor-Quality Products Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Vetnique Imposes Additional Requirements on Its Authorized Sellers Who Sell Online

66.     As shown in the consumer reviews cited above (*see* ¶¶ 37-42, *supra*), Vetnique products sold online are more susceptible to quality and authenticity problems because consumers cannot see products before buying them.  These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.  Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Vetnique imposes additional quality control requirements on all of its Authorized Sellers that sell Vetnique products online.

19

67.     The Vetnique Rules allow Authorized Sellers to sell Vetnique products to end-user consumers only through "Permissible Public Websites" and "Authorized Websites." These rules allow Vetnique to oversee all Authorized Sellers who sell Vetnique products online.

68.     A "Permissible Public Website" is a website that: (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name, (2) is not a third-party storefront on an online marketplace website; and (3) lists the Authorized Seller's mailing address, telephone number, and email address. Only a small subset of Vetnique's Authorized Sellers are permitted to sell Vetnique's products on Permissible Websites; many Authorized Sellers are not permitted to do so even if they own and operate a website that meets the criteria of a Permissible Website.

69.     Authorized Sellers must receive prior written approval from Vetnique before they can sell Vetnique products on any website that does not meet the criteria of a Permissible Public Website. To obtain this approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Vetnique products, and list the specific websites where they wish to sell products. Applicants then undergo vetting by Vetnique that includes review of their business operating business record and online review history. A website that Vetnique permits an Authorized Seller to use through this process is called an "Authorized Website."

70.     The Vetnique Rules impose numerous additional requirements on Authorized Sellers who sell Vetnique products on Permissible Websites or Authorized Websites (collectively, "Authorized Online Sellers").

71.     For example, Authorized Online Sellers must use images of Vetnique products that are provided or approved by Vetnique and keep product descriptions up to date. Authorized Online

20

Sellers are also prohibited from advertising any Vetnique product they do not carry in their inventory.

72.     The Vetnique Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Vetnique or another third party. These requirements allow consumers of Vetnique products to understand the nature of the seller from whom they are purchasing and enable consumers to contact the seller if any quality issues arise. These requirements also allow Vetnique to protect the public from the sale of poor quality or counterfeit Vetnique products because it allows for easy detection of any Authorized Online Seller that sells poor quality or counterfeit goods.

73.     Authorized Online Sellers who sell Vetnique products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Vetnique. At Vetnique's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Public Website or Authorized Website where Authorized Online Sellers are selling Vetnique products.

74.     Authorized Online Sellers are prohibited from using any third-party fulfillment service that could cause customers to receive Vetnique products from any unauthorized seller's product stock when they purchase from Authorized Online Sellers. Authorized Online Sellers must ensure that, when customers purchase Vetnique products, they receive products either from the Authorized Online Seller's inventory, Vetnique itself, or a different Authorized Seller that has been approved by Vetnique. These requirements ensure that the specific products that meet Vetnique's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Vetnique's quality controls.

21

75.     All websites where Authorized Online Sellers sell Vetnique products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to Vetnique upon request; and (iii) cooperate with Vetnique in investigating negative online reviews related to sales of Vetnique products.

76.     In light of the unique quality control challenges presented by Amazon, as discussed above, Vetnique does not currently allow any of its Authorized Sellers to sell Vetnique products on Amazon.  Vetnique instead itself operates a single third-party storefront on Amazon and prohibits all of its Authorized Sellers from selling Vetnique products on Amazon.  By limiting authorized sales of Vetnique products on Amazon in this way, Vetnique is able to closely monitor its products being sold on Amazon and promptly address any issues that arise.

77.     Vetnique exercises various heightened quality controls over the products it sells on Amazon.  For example, Vetnique applies unique "FNSKU" labels to all Vetnique products it provides to Amazon for fulfillment to customers via Amazon's "Fulfillment by Amazon" service and has affirmatively "opted out" of Amazon's "commingling" practice.  By default, Amazon's policy is to commingle products from different third-party sellers that use Amazon's Fulfillment by Amazon service, such that a consumer ordering from one third-party seller could receive a product provided to Amazon by an entirely different seller.  Thus, when commingling is in effect, a consumer who orders from a seller that followed quality controls prior to shipping products to Amazon's fulfillment centers may nonetheless receive a poor quality or counterfeit product that came from a different seller's inventory.  Vetnique has affirmatively opted out of Amazon's "commingling" practice and incurs additional costs by applying FNSKU labels to all Vetnique

22

products it provides to Amazon, to ensure that all consumers who purchase products from Vetnique on Amazon receive genuine products that have been subject to Vetnique's quality controls.

78.     Vetnique also has access to extensive information provided by Amazon that allows it to confirm its adherence to its quality controls and analyze feedback received from customers. This information includes: (i) its storefront's "Order Defect Rate" and "Return Dissatisfaction Rate" as determined by Amazon, which are calculated in part through negative feedback received from its customers and any report that it shipped poor quality products to Amazon fulfillment centers; and (ii) all positive, neutral, and negative written reviews Vetnique has received from its Amazon customers. Having access to this information is a critical component of Vetnique's quality controls because it allows Vetnique to closely monitor its adherence to its quality controls and take swift remedial action if it receives any negative reviews from customers. Vetnique cannot do this for products sold by any unauthorized sellers on Amazon, such as Defendants.

79.     Vetnique also periodically conducts a test purchase of a Vetnique product from a rotating sample of Authorized Websites and Permissible Public Websites. If Vetnique discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling online—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Vetnique communicates with the responsible Authorized Online Seller and takes any necessary corrective action. Vetnique also has the right to cease selling its products to any Authorized Online Seller that is not adhering to Vetnique's quality control requirements, and to suspend or terminate its status as an Authorized Seller of Vetnique products.

80.     The additional quality control requirements that Vetnique exercises over online sales of its products are legitimate and substantial and have been implemented to allow Vetnique to carefully control the quality of Vetnique products that are sold online and quickly address any quality issues that arise.

81.     Vetnique's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Vetnique products online receive genuine, high quality Vetnique products that abide by Vetnique's quality controls.  Consumers purchasing Vetnique products online would find it relevant to their purchasing decision to know whether a product they are buying is vended by Vetnique or by one of its Authorized Online Sellers that is subject to, and abides by, Vetnique's quality controls.

**Genuine Vetnique Products Come with Vetnique's 3-Month Satisfaction Guarantee; Products Sold By Defendants Do Not**

82.     Vetnique products that are purchased from Vetnique directly or from an Authorized Seller also come with Vetnique's 3-month satisfaction guarantee (the "Satisfaction Guarantee").

83.     Under the Vetnique Satisfaction Guarantee. a customer is able to receive a replacement product or full refund of the purchase price of a Vetnique product within 3 months of the original purchase date if the customer is not fully satisfied with their product.  The complete terms of the Vetnique Satisfaction Guarantee can be viewed at https://www.vetniquelabs.com/pages/vetnique-labs-100-satisfaction-guarantee and are incorporated herein.

84.     Vetnique extends the Vetnique Satisfaction Guarantee only to products that were sold by sellers who are subject to Vetnique's quality controls.  Because products sold by unauthorized sellers are not subject to Vetnique's quality controls and Vetnique cannot ensure the

quality of such products, the Vetnique Satisfaction Guarantee does not cover Vetnique products sold by unauthorized sellers, including Defendants. The Vetnique Satisfaction Guarantee specifically states that "because we are unable to control the quality of our products sold by unauthorized sellers . . . our 100% Satisfaction Guarantee does not apply to products purchased from unauthorized resellers."

### Defendants Are Not Authorized Sellers and Are Illegally Selling Non-Genuine Products Bearing the Vetnique Trademarks

85. Because the unauthorized sale of Vetnique products over the Internet threatens the reputation and goodwill associated with the Vetnique Trademarks, Vetnique actively monitors the sale of its products online.

86. In the course of this monitoring, Vetnique discovered that high volumes of products bearing the Vetnique Trademarks were being illegally sold on Amazon through a storefront called "VeDa Express LLC."

87. Through investigation, Vetnique identified Ramirez as an operator of the "VeDa Express LLC" storefront and a party who is responsible, at least in part, for the unlawful sale of products bearing the Vetnique Trademarks through the storefront. Among other things, Vetnique discovered that: (1) "VeDa Express LLC" storefront states that the "Business Name" of the operator of the storefront is "Daniel Ramirez" and lists a "Business Address" of 11139 Chimineas Avenue, Porter Ranch, CA 91326 (the "Chimineas Avenue Address"); and (2) according to public database records, the Chimineas Avenue Address is Ramirez's personal residence. Discovery may reveal that additional individuals and/or entities, in addition to Ramirez, are also responsible for the conduct complained of herein.

88.     Ramirez is not an Authorized Seller of Vetnique products and is not subject to, and does not comply with, the Vetnique Rules or the quality controls that Vetnique imposes on its Authorized Sellers.

89.     On May 6, 2024, counsel for Vetnique sent a cease-and-desist letter to Ramirez via overnight mail.  The letter explained that Defendants are infringing the Vetnique Trademarks by selling products through their Amazon Storefront that are materially different from genuine products sold by Vetnique's Authorized Sellers and that are not subject to, do not abide by, and interfere with Vetnique's quality controls.  The letter also explained that Defendants are tortiously interfering with Vetnique's contracts by purchasing products from Authorized Sellers, who are prohibited from selling products to persons or entities who are not Authorized Sellers and who resell the products.  The letter also informed Defendants that Vetnique is located in Illinois, is harmed in Illinois as a result of Defendants' illegal sales of infringing products bearing the Vetnique Trademarks, and that Defendants will be subject to personal jurisdiction in Illinois if Vetnique files suit.   Vetnique's letter demanded that Defendants permanently cease selling products bearing the Vetnique Trademarks and disclose every person and entity that provided Defendants with the products they have sold.

90.     Defendants did not respond to Vetnique's May 6, 2024 letter.  On May 15, 2024, Vetnique sent a second cease-and-desist letter to Defendants by overnight mail that repeated the demands in its May 6 letter.

91.     Defendants likewise did not respond to Vetnique's May 15, 2024 letter and did not cease advertising and selling products bearing the Vetnique Trademarks in the following days.

92.     To date, Defendants have not responded to any of Vetnique's cease-and-desist letters and are continuing to advertise and sell products bearing the Vetnique Trademarks through their Amazon Storefront.

93.     Defendants' disregard of Vetnique's cease-and-desist letters and continued sales of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

94.     Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Vetnique Trademarks through their Amazon Storefront.  Upon information and belief, through their storefront on the highly interactive Amazon website, Defendants accept and fulfill orders from Illinois residents for products bearing the Vetnique Trademarks and cause substantial quantities of infringing products bearing the Vetnique Trademarks to be shipped to persons located in Illinois through the regular course of business.

95.     As of the time of filing, Defendants' Amazon Storefront is called "VeDa Express LLC."  Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID number for Defendants' Amazon Storefront is A2IU1K21JNQCVG.  Even if Defendants change the name of their Amazon Storefront at some time in the future, their storefront can always be accessed at the following link that includes the storefront's Merchant ID number: https://www.amazon.com/sp?seller=A2IU1K21JNQCVG.

**Defendants Are Infringing the Vetnique Trademarks by Selling Products Bearing the Vetnique Trademarks That Are Not Subject To, Do Not Abide By, and Interfere With Vetnique's Quality Control and Customer Service Requirements**

96.     Defendants are not Authorized Sellers of Vetnique Products, are not subject to Vetnique's quality controls, and do not comply with the Vetnique Rules or the quality controls that Vetnique imposes on its Authorized Sellers.

97.     Defendants, without authorization from Vetnique, have sold—and continue to sell—products bearing the Vetnique Trademarks through their Amazon Storefront.  Defendants may also be selling products through additional channels that Vetnique has not yet discovered and cannot discover until it is able to take discovery.

98.     Vetnique has implemented quality control and customer service requirements throughout its authorized channels of distribution.  The products sold by Defendants are not genuine Vetnique products because they are not subject to, do not abide by, and interfere with Vetnique's quality control and customer service requirements that Authorized Sellers must follow.

99.     Vetnique's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject, do not abide by, and interfere with these requirements, Vetnique has lost control of the quality of goods that bear its trademarks.

100.     Defendants do not abide by Vetnique's quality control requirements because they sell products on Amazon.  Vetnique does not allow any of its Authorized Sellers to sell Vetnique products on Amazon because of the goodwill and consumer safety issues associated with uncontrolled sales on online marketplaces discussed above.  *See* ¶¶ 19-35, *supra*.

101.     Defendants also do not abide by Vetnique's quality control requirements—and interfere with Vetnique's quality controls—because they have not provided Vetnique with their

28

business information nor given Vetnique an opportunity to vet them to determine if they meet Vetnique's high standards for what it demands of its Authorized Sellers that it approves to sell Vetnique products online through Authorized Websites. Instead, Defendants sell products online without Vetnique's authorization or oversight.

102. Defendants do not comply with Vetnique's quality control requirements—and interfere with Vetnique's quality controls—because they have not disclosed to Vetnique where they sell Vetnique products online. Defendants also do not provide customer feedback to Vetnique that relates to their sales of products bearing the Vetnique Trademarks or cooperate with Vetnique in investigating negative online reviews relating to their sales of products bearing the Vetnique Trademarks, as Authorized Online Sellers are required to do. These actions prevent Vetnique from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Vetnique Trademarks.

103. Defendants also do not comply with Vetnique's quality control requirements—and interfere with Vetnique's quality controls—because they: (1) have not disclosed to Vetnique where they acquire products that bear the Vetnique Trademarks; and (2) have not given Vetnique the right to audit and inspect their facilities and records. As a result, among other things, Vetnique cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor quality or expired products; (iii) selling products only in official and unaltered Vetnique packaging; (iv) improperly allowing products that have been returned or repackaged to be listed as "new" products; (v) placing FNSKU labels on the products they provide to Amazon or instead allowing Amazon to commingle their products with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants' Amazon Storefront; and (vi) providing exceptional

customer service and responding appropriately to feedback received from customers. Vetnique also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

104.     Customers have written numerous reviews of Defendants' Amazon Storefront in which they complained of receiving products that were previously used, tampered with, unsealed and in opened packaging, damaged, expired, and allegedly counterfeit. Although Amazon has added comments to some of these reviews stating that Amazon takes "responsibility" for the "fulfillment experiences" described in the reviews, the issues and complaints that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than Defendants:[1]

| ★☆☆☆☆ | "Product came with broken safety seal and black stuff on the inside of the jar indicating it had been used, returned, and sold to me as new. Exchanged product for new and the replacement came with a broken safety seal also. Once is a mistake, twice means something is seriously wrong. There's no way I trust a product that someone had their fingers in or could have put something dangerous in." <br> Read less <br> By Alycia Shotwell on May 16, 2024. |

| ★☆☆☆☆ | "Item came broken in package and unusable." <br> By Kindle Customer on February 27, 2024. |

| ★☆☆☆☆ | "Fake product. Don't buy from seller." <br> By Shefali on February 23, 2024. |

| ★☆☆☆☆ | "The little box was open, I don't know if is from someone returning or not" <br> By Belinda on February 9, 2024. |

---

[1] When Amazon sellers utilize the "Fulfillment by Amazon" service, Amazon itself is responsible for shipping the items. At a third-party seller's request, Amazon is able to "strike" a negative review as attributable to Amazon, not the seller—even in situations where, as here, the issues are plainly related to the quality of the seller's product. *See* https://sell.amazon.com/fulfillment-by-amazon.

⭐☆☆☆☆ "I don't understand. You replaced the order for me and this new one was sent without a top again. It makes me think that I am receiving someone else's return and I refuse to use it. I am returning for the second time."
Read less
By S Byrd on September 8, 2023.

⭐☆☆☆☆ "Broken and coming apart. Will be unable to even use this!! "
By L. Monahan on August 24, 2023.

⭐☆☆☆☆ "Item was used and resealed. Disgusting. "
By Natalie on April 10, 2023.

⭐⭐☆☆☆ "That was supposed to be a gift. The box looked worn out and the contents previously used. Looks like that was a return from another customer. This should have been marked down. This is terrible!!! "
Read less
By Art4Art on December 24, 2023.

⭐⭐⭐☆☆ "one of the items is expired. same items in the same order were shipped separately. Got refund from Amazon quickly, which is good part "
By Lihui l. on July 6, 2023.

105.    These reviews are only a sample of the negative reviews that customers have written about Defendants and their Amazon Storefront.  Vetnique allows its products to be sold only by itself and by Authorized Sellers who are subject to its quality controls to prevent customers from suffering experiences like those described in the above complaints about Defendants.

106.    These reviews, along with the numerous negative reviews that customers have written of Vetnique products that Defendants have sold, *see supra* ¶¶ 37-43, show that Defendants are very likely not carrying out the quality-control inspection, storage, or handling requirements that Vetnique requires Authorized Sellers to follow for Vetnique products.  Instead, Defendants are likely selling products bearing the Vetnique Trademarks to consumers that are previously used, tampered with, not sealed, missing components, damaged, and expired.  These sales cause customers to write highly negative reviews of Vetnique products that harm Vetnique's reputation and hurt the placement of Vetnique products in search results.

31

107.    Defendants' failure to abide by the Vetnique Rules prevents Vetnique from exercising control over the quality of products Defendants sell bearing the Vetnique Trademarks. Unlike with its Authorized Online Sellers, Vetnique cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

108.    Through their unauthorized use of the Vetnique Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Vetnique products. In reality, however, the products sold by Defendants are materially different from genuine Vetnique products—and are not genuine products—because they are not subject to, do not abide by, and interfere with Vetnique's quality control and customer service requirements that Authorized Sellers must follow.

**Defendants Are Infringing the Vetnique Trademarks by Selling Products Bearing the Vetnique Trademarks That Do Not Come With the Vetnique Satisfaction Guarantee**

109.    As set forth above, genuine Vetnique products purchased from Vetnique or Vetnique's Authorized Sellers come with the Vetnique Satisfaction Guarantee. However, Vetnique does not provide the Vetnique Satisfaction Guarantee for products purchased from any other seller because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

110.    Because Defendants are not Authorized Sellers and are thus not subject to Vetnique's quality control requirements, the products bearing the Vetnique Trademarks that Defendants sell do not come with the Vetnique Satisfaction Guarantee.

111.    Because the products Defendants sell do not come with the Vetnique Satisfaction Guarantee, they are materially different from genuine Vetnique products.

112.    The Vetnique Satisfaction Guarantee is a material component of genuine Vetnique products.  Consumers considering whether to purchase Vetnique products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Vetnique Satisfaction Guarantee.  Consumers who purchase Vetnique products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Vetnique stands behind the product, and that they can get a refund or product replacement if they are not satisfied.

113.    Defendants' unauthorized sale of non-genuine products bearing the Vetnique Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Vetnique products that come with the Vetnique Satisfaction Guarantee when, in fact, they are not.

### Defendants Are Tortiously Interfering With Vetnique's Agreements With Its Authorized Sellers

114.    As discussed, Vetnique allows Vetnique's products to be sold to end-user consumers only by itself and by Authorized Sellers.

115.    Vetnique has entered into agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Vetnique products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

116.    Defendants have sold and are continuing to sell a high volume of products bearing the Vetnique Trademarks on the Internet.  Vetnique has not itself sold any Vetnique products to Ramirez.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.  Thus, upon information and

belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

117. By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Vetnique.

118. Defendants have known that Vetnique's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

119. Defendants have known of this prohibition since at least approximately May 6, 2024. On that date, Vetnique overnight mailed a cease-and-desist letter to Defendants explaining that Vetnique has agreements with all of its Authorized Sellers that prohibit them from selling Vetnique products to any person or entity that, like Defendants, is not an Authorized Seller but intends to resell the products.

120. Vetnique's letter also informed Defendants that, by purchasing Vetnique products from an Authorized Seller for the purpose of reselling them, they are causing a breach of the agreement between Vetnique and its Authorized Seller and are interfering with Vetnique's agreements and business relationships.

121. Vetnique's May 6, 2024 letter also advised Defendants that if they continued to acquire products from Vetnique's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with Vetnique's contracts and business relationships with its Authorized Sellers.

122. Despite being provided this information, upon information and belief, Defendants intentionally, knowingly, and willfully interfered with Vetnique's agreements with its Authorized

34

Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

123.    In interfering with Vetnique's agreements, Defendants acted without justification and with a wrongful purpose. Defendants purchased Vetnique products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Vetnique—so that Defendants could unlawfully infringe upon and materially damage the value of the Vetnique Trademarks by reselling the products on the Internet, thereby committing an independent tort.

124.    Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**Vetnique Has Suffered Substantial Harm as a Result of Defendants' Conduct**

125.    As set forth above, the unauthorized sale of products bearing the Vetnique Trademarks by unauthorized sellers such as Defendants has caused significant harm to the Vetnique brand.

126.    When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Vetnique. As such, Defendants' ongoing sale of non-genuine products bearing the Vetnique Trademarks harms Vetnique and its brands.

127.    Vetnique has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

128.    Vetnique has also suffered, and will continue to suffer, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

129.     Vetnique is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Vetnique Trademarks, causing continued irreparable harm to Vetnique's reputation, goodwill, relationships, intellectual property, and brand integrity.

130.     Additionally, Vetnique is entitled to injunctive relief requiring Defendants to return or destroy infringing products because without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

131.     Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

132.     Defendants' willful infringement of the Vetnique Trademarks and continued pattern of misconduct demonstrate intent to harm Vetnique.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(A)

133.     Vetnique hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

134.     Vetnique is the owner of the Vetnique Trademarks.

135.     Vetnique has registered the Vetnique Trademarks with the United States Patent and Trademark Office.

136.     The Vetnique Trademarks are valid and subsisting trademarks in full force and effect.

137.     Defendants willfully and knowingly used, and continue to use, the Vetnique Trademarks in interstate commerce for the purpose of selling non-genuine products bearing the Vetnique Trademarks without Vetnique's consent.

36

138.    The products bearing the Vetnique Trademarks that Defendants sell are not authorized for sale by Vetnique.

139.    Defendants' use of the Vetnique Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Vetnique Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Vetnique when they are not.

140.    Defendants' use of the Vetnique Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Vetnique products.

141.    The products sold by Defendants are not, in fact, genuine Vetnique products.  The products sold by Defendants are materially different from genuine Vetnique products because, among other reasons, they are ineligible for the Vetnique Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Vetnique's quality control requirements.

142.    Defendants' unauthorized use of the Vetnique Trademarks has infringed upon and materially damaged the value of the Vetnique Trademarks and caused significant damage to Vetnique's business relationships.

143.    As a proximate result of Defendants' actions, Vetnique has suffered, and will continue to suffer, immediate and irreparable harm.  Vetnique has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

144.    Vetnique is entitled to recover its damages caused by Defendants' infringement of the Vetnique Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

145. Vetnique is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, Vetnique will suffer irreparable harm.

146. Vetnique is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Vetnique Trademarks.

### SECOND CAUSE OF ACTION
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

147. Vetnique hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

148. As set forth above, Defendants are selling non-genuine products bearing the Vetnique Trademarks that are materially different from genuine Vetnique products.

149. Defendants' sale of non-genuine products bearing the Vetnique Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Vetnique when they are not.

150. Defendants' sale of non-genuine products bearing the Vetnique Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Vetnique products when they are not.

151. Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

152. Vetnique is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Vetnique will suffer irreparable harm.

153.     Vetnique is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

### THIRD CAUSE OF ACTION
### Violation of the Illinois Uniform Deceptive Trade Practices Act
### 815 ILCS 510/1 – 510/7

154.     Vetnique hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

155.     Vetnique is the owner of the Vetnique Trademarks.

156.     Vetnique has registered the Vetnique Trademarks with the United States Patent and Trademark Office.

157.     The Vetnique Trademarks are valid and subsisting trademarks in full force and effect.

158.     Defendants willfully and knowingly used, and continue to use, the Vetnique Trademarks in interstate commerce, including through their product listings on Amazon, for the purpose of advertising, promoting, and selling products bearing the Vetnique Trademarks without Vetnique's consent.

159.     Defendants' advertisements and promotions of products unlawfully using the Vetnique Trademarks have been disseminated to the relevant purchasing public.

160.     Defendants use the Vetnique Trademarks with the intent that consumers will rely on their use of the Vetnique Trademarks and believe that they are selling genuine Vetnique Products.

161. Vetnique has not authorized Defendants to advertise, promote, or sell products bearing the Vetnique Trademarks, and Vetnique does not know the source of the products Defendants are/have been selling.

162. The products Defendants advertise, promote, and sell bearing the Vetnique Trademarks are not covered by the Vetnique Satisfaction Guarantee.

163. Vetnique has established substantial quality control procedures that genuine Vetnique Products must comply with.

164. Vetnique abides by these quality control procedures and requires all Authorized Sellers to abide by them as well. Vetnique's quality controls are legitimate and material, as they protect consumers from receiving poor quality products that could harm them. When a consumer considers whether to purchase a product bearing the Vetnique Trademarks, the applicability of Vetnique' quality controls to the product is relevant and material to the consumers' purchasing decision.

165. The products bearing the Vetnique Trademarks that Defendants advertise, promote, and sell are not subject to, do not abide by, and interfere with Vetnique's quality controls and customer service requirements.

166. Because the products Defendants advertise, promote, and sell bearing the Vetnique Trademarks are not covered by the Vetnique Satisfaction Guarantee, and are not subject to, do not abide by, and interfere with Vetnique's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Vetnique Products sold by Authorized Sellers.

167. Because the products Defendants advertise, promote, and sell bearing the Vetnique Trademarks are materially different from Vetnique Products sold by Authorized Sellers, the products Defendants sell are not genuine Vetnique Products.

168. Defendants' unauthorized advertisement, promotion, and sale of products bearing the Vetnique Trademarks interfere with Vetnique's quality controls and ability to exercise quality control over products bearing the Vetnique Trademarks.

169. Defendants' unauthorized advertisement, promotion, and sale of products bearing the Vetnique Trademarks are likely to cause confusion, cause mistake, and/or deceive consumers because Defendants' use of the Vetnique Trademarks suggests that the products Defendants offer for sale are subject to and compliant with Vetnique's quality controls when, in fact, they do not and are not. Defendants' unauthorized advertisement, promotion, and sale of products bearing the Vetnique Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Vetnique Trademarks suggests that the products Defendants offer for sale are genuine Vetnique Products when, in fact, they are not.

170. Defendants' unauthorized advertisement, promotion, and sale of products bearing the Vetnique Trademarks are likely to cause confusion or misunderstanding among consumers because Defendants' use of the Vetnique Trademarks suggests that the products Defendants offer for sale are sourced from, sponsored by, approved by, or certified by Vetnique when, in fact, they are not.

171. Defendants' unauthorized advertisement, promotion, and sale of products bearing the Vetnique Trademarks are likely to cause confusion or misunderstanding among consumers because Defendants' use of the Vetnique Trademarks suggests that the products Defendants offer for sale are affiliated with, connected with, associated with, or certified by Vetnique when, in fact, they are not.

41

172.     Defendants' unauthorized and deceptive use of the Vetnique Trademarks is material and likely to influence customers to purchase the products Defendants sell, as consumers are likely to believe that products Defendants advertise using the Vetnique Trademarks are genuine Vetnique Products that are subject to, and abide by, Vetnique's quality-control requirements and come with benefits associated with genuine Vetnique Products when, in fact, they do not.

173.     Defendants' unauthorized use of the Vetnique Trademarks in advertising and otherwise infringes the Vetnique Trademarks.

174.     Defendants' use of the Vetnique Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Vetnique Trademarks is a deceptive trade practice under 815 ILCS 510/2.  As a result of Defendants' conduct, Vetnique has suffered, and continues to suffer, immediate, and irreparable harm. This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will remain on Amazon permanently, harming Vetnique's reputation among consumers and placement in online search results.

175.     Vetnique has also suffered, and continues to suffer, damages including, but not limited to, loss of business, diminished goodwill, reputational harm, and decreased profits in an amount to be proven at trial.

176.     Pursuant to 815 ILCS 510/3, Vetnique is entitled to an injunction enjoining Defendants' unlawful conduct, and an award of attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**Common Law Trademark Infringement**

177.     Vetnique hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

178.    Vetnique is the owner of the Vetnique Trademarks.

179.    Vetnique has registered the Vetnique Trademarks with the United States Patent and Trademark Office.

180.    The Vetnique Trademarks are valid and subsisting trademarks in full force and effect.

181.    The Vetnique Trademarks are distinctive and widely recognized by the consuming public. Vetnique Products are sold and purchased through its Authorized Sellers throughout the United States, including in Illinois.

182.    Vetnique is widely recognized as the designated source of goods bearing the Vetnique Trademarks.

183.    Defendants willfully and knowingly used, and continue to use, the Vetnique Trademarks in interstate commerce for purposes of selling products bearing the Vetnique Trademarks without Vetnique's consent.

184.    The products bearing the Vetnique Trademarks that Defendants sell are not authorized for sale by Vetnique.

185.    Defendants' use of the Vetnique Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Vetnique Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Vetnique when they are not.

186.    Defendants' use of the Vetnique Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Vetnique products.

187.   The products sold by Defendants are not, in fact, genuine Vetnique products.  The products sold by Defendants are materially different from genuine Vetnique products because, among other reasons, they are ineligible for the Vetnique Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Vetnique's quality control requirements.

188.   Defendants' unauthorized use of the Vetnique Trademarks has infringed upon and materially damaged the value of the Vetnique Trademarks and caused significant damage to Vetnique's business relationships.

189.   As a proximate result of Defendants' actions, Vetnique has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

190.   Vetnique is entitled to recover its damages caused by Defendants' infringement of the Vetnique Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

191.   Vetnique is entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Vetnique's rights.

## FIFTH CAUSE OF ACTION
### Tortious Interference with Existing Contracts and Business Relationships

192.   Vetnique hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

193.   Other than products that Vetnique itself directly sells to consumers, Vetnique products are sold to the public exclusively through Vetnique's network of Authorized Sellers.

194.    Vetnique has entered into valid and enforceable agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Vetnique products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

195.    Defendants are not Authorized Sellers and have sold—and are continuing to sell—a high volume of products bearing the Vetnique Trademarks on the Internet.  Vetnique has also not itself sold any Vetnique products to Defendants.

196.    Based on these facts, it is reasonable to infer that Defendants acquired the products they are selling at least in part from one or more of Vetnique's Authorized Sellers.

197.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Vetnique.

198.    Defendants have known that Vetnique's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

199.    Defendants have known of this prohibition, among other reasons, because Vetnique informed Defendants of this prohibition in a cease-and-desist letter it overnight mailed to Defendants on May 6, 2024.

200.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Vetnique's agreements with its Authorized Sellers by continuing to induce Authorized Sellers to breach their agreements and sell products to Defendants so that Defendants could unlawfully resell them.

201.    In interfering with Vetnique's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Vetnique products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Vetnique—so that Defendants could unlawfully infringe upon and materially damage the value of the Vetnique Trademarks by reselling the products on the Internet, thereby committing an independent tort.

202.    Vetnique's agreements with its Authorized Sellers are a specific class of contract that Defendants are causing Authorized Sellers to breach when they purchase products from Authorized Sellers for resale.  Although Vetnique does not yet know which specific Authorized Seller(s) have breached their agreements with Vetnique—and indeed cannot learn that information with certainty until it is able to take discovery from Defendants in this action—Defendants know from whom they obtained the products they have resold and are on notice of the basis for Vetnique's claim of tortious interference.

203.    Defendants are not parties to the contracts they caused Authorized Sellers to breach.

204.    Defendants' actions have caused injury to Vetnique for which Vetnique is entitled to compensatory damages in an amount to be proven at trial.

205.    The injury to Vetnique is immediate and irreparable, as Vetnique's reputation and relationships have been damaged among its consumers and Authorized Sellers.

206.    Vetnique is also entitled to recover punitive damages because Defendants have acted with fraud and actual malice, or with such gross negligence as to indicate a wanton disregard of Vetnique's rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Vetnique prays for relief and judgment as follows:

46

A.      Judgment in favor of Vetnique and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      An accounting of Defendants' profits from their sales of infringing products bearing the Vetnique Trademarks;

C.      A permanent injunction enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

      i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Vetnique Trademarks;

      ii)     Prohibiting the Enjoined Parties from using any of the Vetnique Trademarks in any manner, including advertising on the Internet;

      iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Vetnique Trademarks;

      iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Vetnique Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and

47

any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Vetnique's products, or any of the Vetnique Trademarks;

vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Vetnique Trademarks which associate Vetnique's products or the Vetnique Trademarks with the Enjoined Parties or the Enjoined Parties' websites;

vii)     Requiring the Enjoined Parties to take all action to remove the Vetnique Trademarks from the Internet, including from the website www.amazon.com; and

viii)     Requiring the Enjoined Parties to destroy or return to Vetnique all products bearing the Vetnique Trademarks in their possession, custody, or control.

D.     An order requiring Amazon.com, Inc. to freeze all funds in any accounts owned or controlled by Defendants;

E.     An award of attorneys' fees, costs, and expenses.

F.     Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Vetnique demands a trial by jury on all issues so triable.

Dated:  June 21, 2024                    Respectfully submitted,

                                         */s/ Daniel C.F. Wucherer*
                                         Daniel C.F. Wucherer
                                         VORYS, SATER, SEYMOUR AND PEASE LLP
                                         301 E. 4th Street, Suite 3500
                                         Cincinnati, OH 45202
                                         Tel: (513) 723-4093
                                         dcwucherer@vorys.com

                                         **Attorneys for Plaintiff Vetnique Labs LLC**